385 P.2d 691

G. W. CLARK and Ben F. Williams, Sr.,
Appellants,

v.

COMPANIA GANADERA de CANANEA, S. A., a corporation, et al., Appellees.

No. 7156.

Supreme Court of Arizona.

In Division.

Oct. 16, 1963.
Rehearing Denied Dec. 10, 1963.

John M. Williams, Douglas, for appellee Florence G. Sharp.

James M. Murphy, Tucson, for appellee Clarence Kirk Greene.

James V. Robins, Nogales, for appellee Charles Harrison Greene.

Beer, Seaman & Polley, Phoenix, for appellees, Virginia Sturdivant and Cia. Minera de la Trinidad, a corporation, Trustee for Virginia Sturdivant.

JENNINGS, Justice.

G. W. Clark and Ben F. Williams, Sr., brought this action for breach of contract against Compania Ganadera de Cananea, Ranchos de Cananea and numerous other defendants. At the close of plaintiffs' case the trial court directed a verdict for all defendants except Compania Ganadera de Cananea and dismissed the complaint without prejudice as to the latter. All of the defendants in the lower court excepting Compania Ganadera de Cananea and Kemper Marley are parties to this appeal and are hereinafter referred to as appellees. The main question raised is whether the directed verdict was proper under the circumstances.

The transaction involved in this action commenced on August 21, 1957, when Texas Order Buying Company, appellants' assign-

---

Ben F. Williams, Jr., and W. Shelley Richey, Douglas, for appellants.

Evans, Kitchel & Jenckes, Phoenix, for appellees Compania Ganadera De Cananea, S. A., Ranchos De Cananea, Octavio Elias, Enrique Cubillas, Kemper Marley and Frank T. Greene.

Gentry & McNulty, Bisbee, for appellees Estate of Mary Greene Wiswall, deceased, and George A. Wiswall, Executor.

or, wrote a letter to Ranchos de Cananea and/or Compania Ganadera de Cananea as follows:

"RANCHOS DE CANANEA
"Apartado Postal No. 12
"Cananea, Sonora, Mex.

 "August 21, 1957.

"Ranchos de Cananea and/or Cia. Ganadera de Cananea, S. A., Cananea, Sonora, Mexico.

 "I hereby confirm my offer made verbally to Mrs. Florence G. Sharp and Mr. C. Kirk Greene, representing *the companies above,* on August 20, 1957, as follows:

 "I agree to buy up to 2000 head of steer yearlings for delivery about November 1, 1957 and up to 4500 head of ORO steer calves for delivery in December, 1957 and April or May, 1958, the exact dates to be determined later.

 "The price will be $25.50 per cwt. on the steer yearlings and $26.00 per cwt. on the steer calves, delivered on the American border and paid for on the weights determined by the U. S. Customs House for payment of duties.

 "These cattle will be shown to me on *your* ranches in Mexico, at which time I will be allowed to take a cut of 10% in addition to any unmerchantable steers.

"The cattle to be crossed will be placed in dry corrals for not less than 12 hours and will not be fed or watered until after they have been weighed.

 "I hereby tender my check for $60,-000.00 (sixty thousand dollars) as earnest money, at the rate of $10.00 per head, to be deducted from the final settlement. I agree to furnish a bank guaranty for the balance owed on the cattle as soon as the *sales contract* is signed by *you.*

 "Delivery of the cattle is contingent upon there being no restrictions imposed by Mexico or the United States on competent authority.

 *"You agree not to bank this check until the sales contract is signed by both parties,* or their authorized representatives and in case it is not signed within a reasonable time you will return this check to me on demand.

 "Texas Order Buying Company
 "By G. W. Clark"

"Receipt of $60,000.00 (sixty thousand dollars) earnest money is acknowledged herewith.

 "F. G. Meyer
 "Office Manager"

*"Copy of contract is to be sent in with draft when it is sent in for collection."*
(Emphasis ours.)

In addition to signing the offer of purchase on behalf of Texas Order Buying Company, Clark also issued to Fred G. Meyer a draft for Sixty Thousand Dollars ($60,000.00). The draft was made payable to the order of Ganadera and Meyer acknowledged receipt thereof in his capacity as office manager of Ranchos.

On September 27, 1957, a meeting was held by certain officials of Ranchos and the following resolution was adopted:

*"RANCHOS DE CANANEA*

"MEETING OF CO-PROPRIE-TORS, HELD ON SEPTEMBER 27, 1957, AT CANANEA SONORA, MEXICO.

*"EXTRACT OF MINUTES*

*"RESOLVED, that the proposition made by Texas Order Buying Company,* represented by Mr. G. W. Clark, *under date of August 21st, 1957, be and it is hereby accepted, to purchase from* Ranchos de Cananea *the cattle therein set forth, at the prices bid; and that Mr. Fred G. Meyer be,* and he hereby is, *authorized* and directed *to carry out this Resolution,* adopted by majority of the co-proprietors and by a majority of interests in Ranchos de Cananea, and to execute the necessary documents *in order that the aforesaid sale may be effectuated, up to and including the delivery of the cattle involved and the payment to Ranchos de Cananea, of the price thereof.* Inasmuch as Compania Ganadera de Cananea, S. A., is the Company which ordinarily has made heretofore the exportations of cattle, there should be sold to the said Compania Ganadera de Cananea, S. A. the number of head of cattle which the latter Company should in turn sell to the Texas Order Buying Company, represented by Mr. G. W. Clark, in order that said Compania Ganadera de Cananea, S. A., may execute all documents necessary for the sale and exportation of the cattle, all such transactions to be carried out in the manner in which they usually have been made in the past, with regard to their transfer from Ranchos de Cananea to Compania Ganadera de Cananea, S. A." (Emphasis ours.)

"Emilio Segura, Jr.,
"Secretary."

Subsequently, on October 1, 1957, a formal written contract was entered into by Texas Order Buying Company and Ganadera as follows:

"COMPANIA GANADERA DE CANANEA, S. A.

"Cananea, Sonora, Mexico.

"This contract was made and entered into this 1st day of October, 1957, by and between Texas Order Buying Company, of Amarillo, Texas, buyer, and

Compania Ganadera de Cananea, S. A., seller.

"The buyer has this day agreed to purchase and the seller has this day agreed to sell and deliver at the line corrals, Palominas, Arizona, on the specified delivery dates, the following cattle:

"2,000 head or more, ORO steer yearlings at $25.50 USCy. per cwt.
"4,000 head or more, ORO steer calves, at $26.00 USCy. per cwt.
"Merchantable cuts, steer yearlings, at $18.50 USCy. per cwt.
"Merchantable cuts, steer calves, at $23.00 USCy. per cwt.

"Sale and delivery of these cattle is contingent upon their being no restrictions imposed on their exportation by either Mexican or American competent authorities, or by acts of God. If delivery cannot be made, the deposit of $60,000.00 will be returned to the buyer immediately.

"The buyer will be allowed a 10 per cent cut, after unmerchantable cattle are taken out. The cattle will be cut on our ranches in Mexico.

"Shrink and weighing conditions: The cattle will be dry-penned not less than twelve hours before weighing and will not be fed or watered before they are weighed.

"The payment for cattle will be made, for each crossing, on the Mexican side, as soon as the United States Customs weights are determined, a bank guarantee to be furnished to vendor Company by December 1st, 1957.

"Seller acknowledges receipt of $60,-000.00 dollars paid by buyer as partial payment on said cattle, which amount will be deducted from each settlement at the rate of $10.00 dollars per head.

- "Delivery dates will be as follows:

"2,000 head ORO steer yearlings — December 10, 11, 12, 1957.
"2,000 head ORO steer calves, December 18, 19, 20, 1957.
"2,000 head ORO steer calves, April 30, 1958; approximate dates.

"If yearlings are delivered first, buyer will withhold four cents per pound until the 2000 calves are delivered, when final settlement will be made."

"Accepted at Cananea, Sonora, Mexico, October 1, 1957.

"TEXAS ORDER BUYING COMPANIA GANADERA DE
 COMPANY. CANANEA, S. A.

"G. W. Clark F. Meyer, Treasurer
"Witness Witness Emilio Segura
 Secretary"

When the draft was sent in for collection on or about October 9, 1957, there was attached to it the letter-offer of August 21, 1957, the Ranchos' resolution of September 27, 1957, and the October 1, 1957 contract.

During the year 1958, three thousand seven hundred sixty-six (3,766) head of cattle, including steer calves and yearling steers, were delivered to Texas Order Buying Company. No other cattle were delivered at any time, leaving an undelivered balance of two thousand one (2,001) head of steer calves and two hundred thirty-three (233) head of yearling steers.

After the delivery of the cattle, defendants Mrs. Florence G. Sharp and Clarence Kirk Greene sold their interests in Ranchos to defendants Elias and Cubillas, respectively.[1]

Thereafter, Texas Order Buying Company assigned to appellants all of its rights in the purchase agreement represented by the offer of August 21, 1957, Ranchos' resolution of September 27, 1957, and the contract of October 1, 1957.

Appellants' first assignment of error directs our attention to the question of whether the trial court erred in directing a verdict insofar as it ruled that the offer of August 21, 1957, and the alleged acceptance of Ranchos via the resolution of September 27, 1957 were merged into the written contract between Ganadera and Texas Order Buying Company, dated October 1, 1957. This ruling absolved Ranchos of any liability whatever for the reason that Ranchos did not enter into the latter contract.

■ The trial court erred when it directed a verdict in favor of Ranchos on the ground of merger. Merger with respect to the law of contracts refers to the extinguishment of one contract by its absorption into another contract. Whiddon v. General Mills, Inc., 347 S.W.2d 7 (Tex. Civ.App.1961). A preliminary contract, either oral or written, is not merged into a later one unless the two are between the same parties. Carothers v. James Stewart & Co., 179 N.C. 693, 102 S.E. 615 (1920); Broadway Bank v. Schlater, 17 S.W.2d 591 (Mo.App.1929). The parties here were not the same in both instances. The rule therefore prevents the merger.

■ Appellees maintain, however, that the court reached the right result and that whether the ruling was based on the ground of merger was immaterial. Appellees contend that a contract between Texas Order Buying Company and Ranchos was never consummated and that consequently the di-

1. Ranchos de Cananea was a co-proprietorship organized under the laws of Mexico, the co-proprietors being on September 27, 1957, appellees Mrs. Florence Greene Sharp, Frank T. Greene, Clarence Kirk Greene, Compania Minera de la Trinidad, representing Virginia (Greene) Sturdivant, and the Estate of Mary Greene Wiswall, deceased.

rected verdict as to Ranchos was proper. A directed verdict will be sustained where it was the only result that could be reached legally, Cowen v. Valley Nat. Bank, 67 Ariz. 210, 193 P.2d 918 (1948); Ridara Livestock Co. v. Agricultural Products Co., 61 Ariz. 473, 150 P.2d 761 (1944), although the court acted on wrong reason. Horan v. Richfield Oil Corp., 56 Ariz. 64, 105 P.2d 514 (1940).

In support thereof, appellees argue that the Ranchos' resolution did not constitute a valid acceptance of the offer of August 21, 1957; that even if the resolution could be transformed into an acceptance it was, nevertheless, not communicated to Texas Order Buying Company by Ranchos; and that even assuming there was effected an acceptance and communication thereof, this did not give rise to a contract between Texas Order Buying Company and Ranchos for the reason that the parties had no intention to contract.

 Before going into appellees' arguments we need to examine the evidence more closely. In passing upon the question whether the lower court should have directed a verdict for appellees, the appellate court will view the evidence most strongly against appellees and in the light most favorable to appellants. Also, in such case, whatever competent evidence appellants have introduced, including all inferences that can reasonably be drawn therefrom, is assumed to be true, Mutz v. Lucero, 90 Ariz. 38, 365 P.2d 49 (1961); Figueroa v. Majors, 85 Ariz. 345, 338 P.2d 803 (1959), and, if the evidence is of such character that reasonable minds may differ on the inferences to be drawn from the facts, the case must be submitted to the jury. Swetnam v. F. W. Woolworth Company, 83 Ariz. 189, 318 P.2d 364 (1957).

Formerly there was just one organization which was owned by the Greene family. For reasons unexplained they divided into the two companies involved in this case, Ranchos and Ganadera, both being organized under the laws of Mexico. A very close working relationship existed between these two companies. Reading Ranchos' resolution, we find that Ganadera was sort of a middleman between Ranchos and the purchaser, it being customary for Ganadera to make the exportations to the United States of the cattle sold by Ranchos. Ranchos would sell the cattle to Ganadera so as to enable the latter to make the exportation thereof to the purchaser.

On one occasion prior to the transaction in question, Clark, acting on behalf of Mr. Bob Brass, had purchased cattle from Ranchos and Ganadera. Evidently Clark had some trouble with that purchase as shown by his testimony, and he wanted two contracts for the present purchase,

one with Ranchos and one with Ganadera.[3] Defendant Sharp, who owned an interest in both companies and who was also in close contact with the management of both during the time in question, testified to the effect that she understood as a co-proprietor of Ranchos that there were to be two contracts for this purchase, one with Ranchos and one with Ganadera and that both were to remain in effect until the completion of the sale and delivery of the cattle to Texas Order Buying Company.[3]

■ With this background we will now deal with appellees' contentions in the order listed above. As to whether the Ran-

2. (Clark was having a discussion with Meyer, appellees Sharp and Kirk Greene concerning the present purchase).

"A. Well, I looked at the cattle and came back and Mrs. Sharp said she would have—we agreed on the price and the deliveries and she said she would have Fred (Meyer) fix a letter in two or three days and confirm my offer and I told her, I said * * * and said when he fixed this letter I could meet them, come down there and put up the $60,000. Then they would have a meeting, you know, of the company, and the Ranchos, and I told her we had a little trouble on these other cattle one of the members wiring Brass that I wanted two contracts, one with Ranchos, and one with—

"Q. Ganadera?

"A. Ganadera. And she (Mrs. Sharp) said, 'certainly, that is the way it is going to be fixed.'"

3. (The following statements were not binding on anyone but Mrs. Sharp but they show her subjective feelings on the matter in issue).

"Q. Now, Mrs. Sharp, isn't it true, at least so far as you are concerned as one of the co-proprietors of Ranchos, that you intended that the contract, if it be a contract * * * represented by the offer of August 21st and the acceptance in the resolution of Ranchos on the 27th as one contract, and the letter contract of October 1, 1957, isn't it true that so far as you are concerned as one of the co-proprietors of Ranchos you intended the original contract to remain in effect along with the letter contract of October 1st, 1957?

(There was an objection to this question but the court took the view that there was an ambiguity and allowed the witness to testify).

"Q. Now isn't it true, Mrs. Sharp, that you intended, as far as you were concerned as one of the co-proprietors, for both of these contracts to continue in effect covering the sale of these cattle?

"A. Yes.

(The court at this point instructed the witness that any statements she made would only be binding upon her).

"Q. At the meeting of the co-proprietors on October 1st, isn't it true that you discussed why there would be two contracts; one between Ganadera and one between Ranchos?

(Objection. Finally she was allowed to answer the question but the court again instructed that her statements would not be binding on anyone but herself).

"Q. Isn't it true, Mrs. Sharp, that you did discuss it?

"A. Yes.

* * * * *

"Q. Isn't it true, Mrs. Sharp, that at that meeting you and the others present said, in your presence that it was necessary to make a contract with Ranchos and to secure a contract with Ganadera in order to carry out the ends and to accomplish the ends contained in the offer of Mr. Clark of August 21, 1957?

(Objection. Again the same instruction to the witness).

"Q. Isn't it true that as far as *you* are concerned that is what you said?

"A. Yes."

chos' resolution constituted an acceptance of the offer, appellees agree that the first sentence could be interpreted as an acceptance. In order to create a contract, the acceptance of the offer must be unequivocal. Bullock v. Harwick, 158 Fla. 834, 30 So.2d 539 (1947). The first sentence reads in part: "Resolved, that the proposition made by Texas Order Buying Company * * * be and it is hereby accepted to purchase from Ranchos the cattle therein set forth, at the prices bid * * *." Viewing this in the light most favorable to appellants, the language constitutes an unequivocal acceptance.

Appellees argue though that the second sentence contains one very important modification effecting thereby a counteroffer, namely, that Ranchos was to sell cattle to Ganadera which company was, in turn, to sell to Texas Order Buying Company, making it clear that Ranchos had no intention of undertaking the responsibility of selling and delivering to Texas Order Buying Company any cattle whatever. Appellants maintain that the second sentence does not constitute a counteroffer. In support thereof appellants say the balance of the resolution only relates to the internal dealings between Ranchos and Ganadera; that it had nothing to do with the buyer whatever; that it doesn't effect the point of deliveries, the cuts of the cattle or anything but the relationship between Ranchos and Ganadera. In substance, appellants

contend that the first portion of the resolution constitutes an acceptance of the offer while the latter portion merely spells out the mechanical details as to how to effectuate the sale allegedly entered into by Ranchos and Texas Order Buying Company.

■ An acceptance must comply exactly with the requirements of the offer, omitting nothing from the promise or performance requested. Restatement, Contracts § 59 (1932). Applying the rule the resolution does not vary from the terms of the offer with respect to the number of cattle to be sold and delivered, the type and brand ("Oro" brand owned by Ranchos), the prices to be paid or the points of delivery. The important question raised is whether Ranchos intended to accept the offer as made. If they did, then there is no fatal variance from the terms of the offer as claimed by appellees. This question must be submitted to the jury under proper instructions from the trial court.

It is the position of the appellees that should there be found an acceptance it was, nevertheless, not communicated to Texas Order Buying Company and without the communication of the acceptance of an offer the contract does not come into being. Groskin v. Bookmyer, 310 Pa. 588, 166 A. 233 (1933). Viewing the evidence most favorably to appellants, a jury question arises on this issue. The record discloses that Clark had a meeting with Meyer on October 1, 1957, in Naco. At this time

Clark signed the October 1, 1957 contract. Meyer then delivered to Clark not only a copy of the October 1, 1957 contract, but also a copy of the resolution of Ranchos and Clark took these two papers with him to Douglas. We should remember that Meyer was office manager of Ranchos and treasurer of Ganadera. From this one could reasonably infer that there was effected a communication of the alleged acceptance of Ranchos.

Another factor bearing on the issue of communication is that when the draft was sent in for collection there was attached thereto not only the contract of October 1, 1957 between Texas Order Buying Company and Ganadera but also the August 21, 1957 offer of Texas Order Buying Company and the Ranchos' resolution adopted September 27, 1957. Appellees contend that undoubtedly the resolution was attached by Ganadera for the purpose of satisfying Texas Order Buying Company that it, Ganadera, was in a position to sell the cattle described in the October 1, 1957 contract. In other words, appellees say, Ranchos had gone on record by the resolution as being willing to sell the cattle to Ganadera so as to put Ganadera in a position to make a deal with Texas Order Buying Company.

Appellants, on the other hand, maintain that the attaching of Ranchos' resolution to the draft was a compliance with the terms of the offer and that there was effected thereby a communication. The pertinent terms of the offer are: "You agree not to bank this check until the sales contract is signed by both parties, or their authorized representatives * * *" and "copy of contract is to be sent in with draft when it is sent in for collection."

This language is ambiguous. Appellees contend that the term "sales contract" referred solely to the contract of October 1, 1957 between Texas Order Buying Company and Ganadera and that a fortiori the term "both parties" referred to the buyer and seller, namely, Texas Order Buying Company and Ganadera. Appellants argue though that "both parties" could refer to any one of three possible combinations, namely, Ranchos and Ganadera, Texas Order Buying Company and Ranchos or Texas Order Buying Company and Ganadera. We must remember that the offer was directed to Ranchos and/or Ganadera and was written on Ranchos' letterhead. One could reasonably infer that the "sales contract" was not meant to refer only to the contract of October 1, 1957 between Texas Order Buying Company and Ganadera but rather to the alleged contractual undertakings between Texas Order Buying Company on the one hand and Ranchos and Ganadera on the other. It will be for the jury to determine the meaning of this language in light of the conflicting extrinsic evidence involved in this case.

Appellees further contend that even assuming the jury should find an acceptance

and communication thereof, there was no contract between Texas Order Buying Company and Ranchos for the reason that the parties had no intention to contract. Relying on the language of the offer noted above referring to "the sales contract," appellees argue that this clearly shows that the Texas Order Buying Company intended that no contract would come into existence until a formal written contract between it on the one hand and Ranchos or Ganadera on the other had been prepared and executed by the parties thereto, and that the offer and resolution were merely preliminary negotiations looking to "the sales contract." Appellees say that "the sales contract" referred to the contract of October 1, 1957 between Texas Order Buying Company and Ganadera, and cite the familiar rule that there is not a binding contract where, although its terms have been agreed on orally, the parties have also agreed that it shall not be binding until evidenced by writing, and the same rule applies whether the preliminary negotiations were oral or written. 17 C.J.S. Contracts § 49.

The record discloses sufficient evidence from which a jury could find that Texas Order Buying Company and Ranchos intended to contract with each other. The testimony of Clark and defendant Sharp referred to supra bears on this issue. The court, at the end of plaintiffs' case, made the statement "I feel that the plaintiffs have established a prima facie case." Also,

when Elias and Cubillas purchased the interests of Sharp and Greene respectively, their agreement contained a recital that "the contract for the sale of cattle entered into by *Ranchos and* Ganadera with Mr. Clark * * * had not as yet been complied with in full." We hold that the evidence is of such character that reasonable minds may differ on the inferences to be drawn from the facts as to whether there was effected a contract between Texas Order Buying Company and Ranchos, thus requiring the submission of the case to the jury. Swetnam v. F. W. Woolworth Company, supra.

Appellees submit that even should this court conclude that a contract for the sale of cattle existed between Ranchos and appellants' assignors it would, nevertheless, be compelled to affirm the judgment of the lower court for the reason that the record before this court does not disclose a breach of such contract or damages sustained by appellants' assignors as a result of such breach. In answer to this we hold that the issues of breach of contract and damages are not properly before us at this time. Apart from the second assignment of error the only issue we are concerned with is whether there was sufficient evidence adduced coupled with the legitimate inferences to be derived therefrom to support the contention of appellants that there was consummated a contract between Texas Order Buying Company and Ranchos, thus re-

quiring the submission of the case to the jury. Barker v. General Petroleum Corp., 72 Ariz. 238, 233 P.2d 449 (1951); Joseph v. Tibsherany, 88 Ariz. 205, 354 P.2d 254 (1960).

 Neither are the issues regarding the capacity of Ranchos to be sued and the liability of the individual members of the co-proprietorship properly before us at this time. These are matters of defense not adduced at the trial and therefore not now reviewable.

The second and final assignment of error, which would become material should the jury determine that there was consummated a contract between Ranchos and Texas Order Buying Company, deals with the court's ruling that a provision in the contract of purchase between Elias and Cubillas on the one hand and Sharp and Greene on the other constituted one of indemnity rather than one assuming liability.

The provision written in Spanish is translated as follows:

"NINTH.—The assignor makes known to the purchasers the existence of a contract of sale of cattle that was entered into by Ranchos de Cananea and Compania Ganadera de Cananea, S. A., with Mr. Garland Clark, representative of the Texas Order Buying Company, and that said contract has not been complied with in full, because the Mexican Government did not concede the corresponding exportation permits and by the opposition of part of the co-proprietors who were not in accord with said contract; *appreciating that the purchasers, assignees or persons that they designate, shall be responsible of [sic] the consequences that may result from its incompletion.*" (Emphasis ours.)

It should be kept in mind that Elias and Cubillas purchased the interests of Sharp and Greene in Ranchos subsequent to the time that the writing between Texas Order Buying Company and Ranchos and Ganadera were entered into.

 Appellees maintain that this was neither more nor less than an agreement on the part of Elias and Cubillas to indemnify their assignors in the event the latter should sustain any loss as the result of the nonperformance of the contract. In support of their position appellees cite the general rule that no one may sue upon a contract of indemnity other than the indemnitee or some one suing in his right, such as his assignee. 42 C.J.S. Indemnity § 29. Appellants contend that by reason of the provision Elias and Cubillas became directly liable to Texas Order Buying Company for breach of contract.

 Appellants suggest that the lower court should have submitted to the jury the question of determining the intention

of the parties with respect to this provision. We agree. Although appellees argue contrariwise, we hold that the agreement is ambiguous and that it is necessary to take into consideration the surrounding facts and circumstances in determining this question. It will be for the jury to determine what those facts and circumstances were. Ridara Livestock Co., v. Agricultural Products Co., supra.

This cause is reversed and remanded for a new trial.

UDALL, V. C. J., and STRUCKMEYER, J., concur.